John Meyer, MT Bar # 11206
Cottonwood Environmental Law Center
P.O. Box 412 Bozeman, MT 59771
(406) 546-0149 | Phone
John@cottonwoodlaw.org

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, GALLATIN WILDLIFE ASSOCIATION, YELLOWSTONE BUFFALO FOUNDATION | )<br>)<br>)<br>)<br>) |
| | ) |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| U.S. SHEEP EXPERIMENT STATION; AGRICULTURAL RESEARCH SERVICE | )<br>)<br>) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. 9:17-cv-00155-DLC

BRIEF IN SUPPORT OF MOTION FOR INJUNCTION PENDING APPEAL

# TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………...1

II.     STANDARD OF REVIEW……………………………………...........1

III.    ARGUMENT……………………………………………………….......2

    1. Cottonwood has raised serious questions on the merits……….........2

    2. Cottonwood faces imminent irreparable harm absent an
       injunction.................................................................................7

       a. Defendants' "bureaucratic steamroller" has caused irreparable
       harm.......................................................................................7

       b. The challenged grazing will cause irreparable harm to Cottonwood
       members' safety, recreation, and aesthetic interests................................9

       c. The challenged grazing will cause irreparable harm to Cottonwood
       members' conservation interests in grizzly bears..................................10

    3. The public interest and balance of harms tip sharply in Cottonwood's
       favor......................................................................................13

    4. No bond should be required………………………….………………...16

IV.     CONCLUSION……………………………………...........................17

CERTIFICATE OF COMPLIANCE………...……………………………….18

# TABLE OF AUTHORITIES

CASES

*All. for the Wild Rockies v. Bradford*
864 F. Supp. 2d 1011 (D. Mont. 2012)....................................................................4

*All. for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011)..............................................................2, 14, 15

*All. for the Wild Rockies v. Kruger*
35 F. Supp. 3d 1259 (D. Mont. 2014)....................................................................1

*Ctr. for Biological Diversity v. Natl. Hwy. Traffic Safety Admin.*
538 F.3d 1172 (9th Cir. 2008)..............................................................................3

*Crow Indian Tribe v. United States*
343 F. Supp. 3d 999 (D. Mont. 2018)....................................................................14

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014)..............................................................................13

*Hoosier Energy Rural Elec. Co-Op v. John Hancock Life Ins. Co.*,
582 F.3d 721, 725 (7th Cir. 2009)……………………………………………..15

*Johnson v. Couturier*
572 F.3d 1067 (9th Cir. 2009)..............................................................................16

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*
752 F.3d 755 (9th Cir. 2014)................................................................................5

*Lujan v. Natl. Wildlife Fed'n*
497 U.S. 871 (1990)......................................................................................7 n.3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
3:01-CV-0640-SI, 2017 WL 1829588 (D. Or. April 3, 2017)..................................8

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
886 F.3d 803 (9th Cir. 2018)................................................................................7

*N. Plains Res. Council v. Surface Transp. Bd.*
668 F.3d 1067 (9th Cir. 2011).................................................................3

*Protecting Arizona's Res. & Children v. Fed. Highway Admin.*
CV-15-00893-PHX-DJH, 2015 WL 12618411 (D. Ariz. July 28, 2015)................8

*Republic of the Philippines v. Marcos*
862 F.2d 1355 (9th Cir. 1988)................................................................2

*Save Our Sonoran, Inc. v. Flowers*
408 F.3d 1113 (9th Cir. 2005)...........................................................16-17

*Sierra Club v. Marsh*
872 F.2d 497 (1st Cir. 1989)...............................................................8

*W. Watersheds Project v. Bernhardt*
2:19-CV-0750-SI, 2019 WL 2372595 (D. Or. June 5, 2019)................................17

*W. Watersheds Project v. U.S. Forest Serv.*
1:17-CV-434-CWD, 2017 WL 5571574 (D. Idaho Nov. 20, 2017)......................16

*Winter v. Nat. Resources Def. Council*
555 U.S. 7 (2008).............................................................................1

STATUTES

42 U.S.C. § 4332(2)(C)(i)....................................................................3

REGULATIONS

40 C.F.R. § 1500.1(b)........................................................................5

40 C.F.R. 1500.2(d)..........................................................................7

40 C.F.R. § 1508.3...........................................................................3

40 C.F.R. § 1508.27(b)(2)....................................................................3

III

## I.  INTRODUCTION[1]

This Court entered an Order and Judgment denying Plaintiffs' Motion for Summary Judgment. Docs. 32 & 34. Plaintiffs Cottonwood Environmental Law Center, Gallatin Wildlife Association, and Yellowstone Buffalo Foundation (collectively "Cottonwood") filed a timely Notice of Appeal. Doc. 35. Cottonwood respectfully requests an injunction pending appeal by June 28, 2019, that enjoins Defendants from grazing domestic sheep in the Centennial Mountains until the Ninth Circuit has decided the appeal.

## II.  STANDARD OF REVIEW

The Ninth Circuit evaluates "motions for preliminary injunction and motions for injunction pending appeal using the same standard." *All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1263 (D. Mont. 2014) (citation omitted). A plaintiff seeking injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Resources Def. Council*, 555 U.S. 7, 22 (2008) (citation omitted).

---

[1] To expedite a decision on this motion, Cottonwood has not briefed the claim regarding the Defendants' failure to supplement the NEPA analysis. Cottonwood will brief the issue in the Ninth Circuit.

Courts in the Ninth Circuit use a "sliding scale" approach under which an "injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted). "Of course, plaintiffs must also satisfy the other *Winter* factors." *Id*. at 1135. "Serious questions" in the context of injunctive relief are those that are "substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Republic of the Phillippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation and internal quotation marks omitted). They do not need to "promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.* (citation and internal quotation marks omitted).

## III.   ARGUMENT

Cottonwood is entitled to an injunction pending appeal because it has raised serious questions on the merits, its members are likely to suffer irreparable harm in the absence of injunctive relief, and the public interest and balance of harms tip sharply in favor of an injunction.

### 1.   **Cottonwood has raised serious questions on the merits.**

Cottonwood has raised serious questions regarding whether Defendants failed to take a hard look at the impacts of the challenged domestic sheep grazing.

"NEPA imposes a procedural requirement on federal agencies to take a 'hard look'

at the potential environmental consequences of the proposed action." *N. Plains*

*Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citation

omitted). To this end, Defendants were required to prepare a detailed

Environmental Impact Statement ("EIS") explaining how domestic sheep grazing

would affect the quality of the "human environment" to the "fullest extent

possible." *Ctr. for Biological Diversity v. Natl. Hwy. Traffic Safety Admin*., 538

F.3d 1172, 1185 (9th Cir. 2008) (quoting 42 U.S.C. § 4332(2)(C)(i)(2007).

In its order denying summary judgment, the Court focused on Cottonwood's

argument that Defendants violated NEPA by failing to disclose dangerous grizzly

bear encounters. Doc. 32 at 12. The 2017 FEIS states:

> Grizzly bears are present on the Summer West and Summer East Ranges.
> However, herders have not encountered grizzly bears on these lands.

Doc. 4-2 at 50. In direct contrast, Cottonwood secured documents in response to a

Freedom of Information Act ("FOIA") request that state:

> "2008—July 28—Big Mountain pasture in West Summer Range. [Sheep
> Station] personnel chased by a grizzly bear. Investigation by APHIS found
> evidence of grizzly activity in the vicinity, but also found black bear sign as
> well.
>
> 2008—August 1—Big Mountain pasture, West Summer Range.
> Herder chased by bear again. 1 ewe killed possibly by black bear."

Doc. 4-5 at 7.

The Court Order denying summary judgment did not directly address the contradiction. In *All. for the Wild Rockies v. Bradford*, the U.S. District Court for the District of Montana enjoined a project for violations of NEPA where the analysis stated grizzly bears were present in the project area while other portions of the analysis stated bears were not present. 864 F. Supp. 2d 1011, 1014-15 (D. Mont. 2012). According to the *Bradford* court, the "natural inference drawn from these contradictions was that consideration of the grizzly bear issues by the agencies was arbitrary and capricious." *Id*. at 1015. The same principle applies here. Defendants violated NEPA by failing to provide the "high quality" information, "accurate scientific analysis," and "public scrutiny" that are "essential to implementing NEPA."  40 C.F.R. § 1500.1(b).

In *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, the Ninth Circuit held that "[i]nformed public participation in reviewing environmental impacts is essential to the proper functioning of NEPA." 752 F.3d 755, 761 (9th Cir. 2014) (citation omitted). Here, the public could not make informed public comments when one section of the EIS states there have been no human/grizzly bear encounters, other sections euphemistically state sheepherders have encountered grizzly bears, but nowhere in any of the analysis did the Defendants disclose that at least one grizzly bear chased humans. The

public was "at risk of proceeding on mistaken assumptions." *Id.* The "lack of clarity renders the EIS deficient." *Id.*

Notwithstanding the lack of clarity, the Court "did not find the FEIS's discussion of the incidents to be lacking." Doc. 32. To support the conclusion, this Court examined the FOIA information offered by Cottonwood and found that "[t]he documentation of the July 28, 2008 encounter shows that [Wildlife Services] was not convinced that a grizzly bear was involved[.]" Doc. 32 at 12 citing Doc. 4-5 at 7. The Court Order states "it was not determined that either incident in 2008 involved a grizzly." Dkt. 32 at 13. Cottonwood respectfully disagrees.

All bear sightings are "reported directly" to Animal and Plant Health Inspection Service ("APHIS") [Wildlife Services]. Doc. 7-2 at 52. The July 28, 2008 grizzly chasing event was "reported" by Sheep Station employees. Doc. 4-5 at 1. Two or more Sheep Station employees reported being chased by the grizzly bear. Doc. 32 at 10; Doc. 7-1 at 26. According to the EIS, Sheep Station personnel go through at least two formal training-orientation meetings per year to review identification of grizzly bears. Doc. 7-2 at 52. The Biological Opinion issued by the U.S. Fish and Wildlife Service and cited by this Court unequivocally states Sheep Station personnel encountered a "grizzly." Doc. 7-1 at 26. The U.S. Fish and Wildlife Service expressed no reservations about the species involved when it stated the July 2008 encounter involved a grizzly bear. Doc. 7-1 at 52.

This Court noted that the "descriptions of the incidents 'were representative of natural bear behaviors and do not demonstrate a loss of wariness to humans.'" Doc. 32 at 13 citing Doc. 7-1 at 31. According to the Biological Opinion, "[g]rizzly bears generally try to avoid human contact." Doc. 7-1 at 30. In contrast, "habituation is the loss of a bear's natural wariness of humans caused by the continued exposure of the bear(s) to human presence, activity, noise, etc. A grizzly bear habituates to other bears, humans, or situations when such interactions give it a positive return in resources, such as food, that outweighs the cost of the stress that precedes such habituation." Doc. 7-1 at 15. The conclusion that the encounters were representative of natural bear behaviors is contrary to the evidence that at least one grizzly bear chased humans near domestic sheep. Dkt. 4-5 at 7. Cottonwood has met the "fair chance" of success standard necessary for an injunction pending appeal. *Marco*s, 862 F.2d at 1362.

Cottonwood argued in its motion for summary judgment that the EIS does not analyze the potential safety impacts of grizzly bears chasing hikers on the Continental Divide Trail. Doc. 22 at 9. Defendants did not respond. Cottonwood has a fair chance of success on the merits. *See* 40 C.F.R. § 1508.27(b)(2); 40 C.F.R. § 1508.3 (requiring federal agencies to analyze the degree to which actions "may" affect "public safety").

## 2. **Cottonwood faces imminent irreparable harm absent an injunction.** [2]

"Irreparable harm should be determined by reference to the purposes of the statute being enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) (citations omitted). "NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council* 668 F.3d at 1072.

### a. **Defendants' "bureaucratic steamroller" has caused irreparable harm.**

Cottonwood requests that this Court adopt what has come to be known as the "bureaucratic steamroller" theory of irreparable harm. *See Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989). Before joining the U.S. Supreme Court, then-judge Breyer wrote in *Marsh*:

> NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account. Thus, *when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered....* Moreover, to set aside the agency's action at a later date will not necessarily undo the harm. The agency as well as private parties may well have become committed to the previously chosen course of action, and new information—a new EIS—may bring about a *new* decision, but it is

---

[2] The U.S. Supreme Court has "no doubt that 'recreational use and aesthetic enjoyment' are among the sorts of interests [NEPA was] specifically designed to protect." *Lujan v. Natl. Wildlife Fed'n*, 497 U.S. 871, 886 (1990).

that much less likely to bring about a *different* one. It is far easier to influence an initial choice than to change a mind already made up.

It is appropriate for the courts to recognize this type of injury in a NEPA case, for it reflects the very theory upon which NEPA is based—a theory aimed at presenting governmental decision-makers with relevant environmental data *before* they commit themselves to a course of action. This is not to say that a likely NEPA violation automatically calls for an injunction; the *balance* of harms may point the other way.

Once large bureaucracies are committed to a course of action, it is difficult to change that course—even if new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.' It is this type of harm that plaintiffs seek to avoid, and it is the presence of this type of harm that courts have said can merit an injunction in an appropriate case.

*Marsh*, 872 F.2d at 500 (citations omitted and emphasis in original).

Although the Ninth Circuit has not directly addressed the theory, district courts have been "persuaded by the reasoning." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 3:01-CV-0640-SI, 2017 WL 1829588 at *12 (D. Or. April 3, 2017) (collecting cases); *Protecting Arizona's Res. & Children v. Fed. Highway Admin.*, CV-15-00893-PHX-DJH, 2015 WL 12618411 at *5 (D. Ariz. July 28, 2015) (denying injunctive relief under "steamroller theory").

Cottonwood sought to have Defendants prepare supplemental NEPA analysis that disclosed sheep herders have been chased by grizzly bears near domestic sheep and analyze how the grazing will impact humans and grizzly bears *before* issuing a Record of Decision. Doc. 1. Had Defendants fully disclosed that grizzly bears were chasing humans, the public could have commented on the

8

conclusion that the grizzly bear chasing the Sheep Station employees had not lost its wariness of people. This Court "acknowledge[d] that inclusion of the word 'chase' could possibly have elicited more public concern over the welfare of sheep herders or grizzly bears." Doc. 32 at 13.

Defendants did not "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment" to "the fullest extent possible" by failing to disclose that at least one grizzly bear chased humans.  40 C.F.R. § 1500.2(d). NEPA's purpose of facilitating informed public participation was steamrolled by Defendants' withholding of this important information. Defendants' failure to disclose the relevant information inflicted the type of irreparable harm that *Marsh* found appropriate for courts to recognize. *See* Doc. 22-1 at 4, ¶ 14 (The agency's Record of Decision and failure to complete a supplemental NEPA analysis injures my personal, conservation, aesthetic, informational, and recreational interest) (Hockett Decl.).

### b. <u>The challenged grazing will cause irreparable harm to Cottonwood members' safety, recreation, and aesthetic interests.</u>

 In addition to causing irreparable harm to Cottonwood's interests in an unbiased NEPA process, Defendants' actions prevent the plaintiffs from using public land, which is causing irreparable harm to their aesthetic, safety, and recreational interests. Doc. 4-1 at 4, ¶13 (Gutkoski Decl.); Doc. 22-1 at 3, ¶ 9 (Hockett Decl.). Cottonwood members cannot enjoy the Continental Divide Trail

and look for wildlife if they are worried about being chased by grizzly bears near

domestic sheep.  Doc. 4-1 at 4, ¶13. Cottonwood members also face irreparable

recreational harm because they cannot hike with their dogs on the Continental

Divide Trail for fear they will be bit by aggressive sheep guard dogs. Doc. 22-1 at

3, ¶ 10 (Hockett Decl.). Defendants have warned of the aggressive guard dogs.

Doc. 7-2 at 29 ("Sheep guard dogs are aggressive toward predators. Keep your

dogs on a leash and away from sheep and guard dogs.") Cottonwood has

demonstrated it will suffer irreparable harm from the challenged grazing.

### c. **The challenged grazing will cause irreparable harm to Cottonwood members' conservation interests in grizzly bears.**

The challenged grazing also poses irreparable harm to Cottonwood

members' conservation interests in grizzly bears and this important grizzly habitat.

Doc. 4-1 at 3, ¶7 (Gutkoski Decl.). This Court recently vacated a U.S. Fish and

Wildlife Service rule removing grizzly bears from the list of threatened species

because "[t]he Service failed to logically support its conclusion that the current

Greater Yellowstone population is not threatened by its isolation." *Crow Indian

Tribe v. United States,* 343 F. Supp. 3d 999, 1019 (D. Mont. 2018).[3]

---

[3] Seven appeals have been filed in the Ninth Circuit. *Crow Indian Tribe v. United States, et. al.,* 18-36030; 18-36038; 18-36042; 18-36050; 18-36077; 18-36078; 18-36080.

The federal government has recognized the Centennial Mountains as the "best linkage habitat" for Yellowstone grizzly bears to connect to other populations. Doc. 4-13 at 2. According to the Interagency Grizzly Bear Study Team:

> This area has been identified as one of the possible linkage areas between the [Northern Continental Divide Ecosystem] and [Greater Yellowstone Ecosystem].
>
> We all know that sheep and grizzly bears do not mix . . . We need to work toward making this linkage zone secure for bear movement. Any migrant is more than likely to be a subadult male and they are most vulnerable to conflicts especially when dispersing. This is the exact scenario for a bear moving through this area.

Doc. 4-8 at 2. The Yellowstone Ecosystem Subcommittee of the Interagency Grizzly Bear Committee said:

> The corridor through the Centennial Mountains is widely regarded by state and federal agencies as well as non-governmental organizations as being critical to wildlife movement between the Greater Yellowstone Ecosystem and the Selway-Bitterroot ecosystem particularly for large carnivores.
>
> For grizzly bears, this corridor is especially important, because the Bitterroot ecosystem contains suitable habitats leading to other occupied recovery areas all the way into Canada, and because grizzly bears are unlikely to reach the Bitterroot by any other path.

Doc. 4-6 at 1.[4]

---

[4] The Yellowstone Ecosystem Subcommittee of the Interagency Grizzly Bear Committee is made up of Yellowstone and Grand Teton National Parks, several National Forests, Montana Fish Wildlife and Parks, Idaho Fish and Game, Wyoming Game and Fish, and several Native American Tribes. Doc. 4-6 at 3.

According to the U.S. Fish and Wildlife Service, "[t]he long-term conservation of grizzly bears in the [Greater Yellowstone Area] continues to depend largely on managing bear-human encounters, which can result in human-caused mortality of grizzly bears." Doc. 7-1 at 16. "[G]rizzly bears seem prone to preying on sheep independently of natural food availability[.]" Doc. 7-1 at 32. "Most situations where grizzly bears are exposed to domestic sheep result in conflict[.]" Doc. 7-1 at 32. The Interagency Grizzly Bear Committee supported the U.S. Fish and Wildlife Service's "Conservation Recommendations" that the Sheep Station "seek replacement lands outside of known grizzly bear use areas for the Sheep Station's Summer Range[.]" Doc. 4-6 at 1.

The U.S. Bureau of Land Management told the Sheep Station that "continued grazing of domestic sheep in the East and West Summer Ranges . . . will only serve to demonstrate why the grizzly bear should remain on the threatened species list." Doc. 26-1 at 3. The decision to graze sheep based on inadequate NEPA analysis causes irreparable harm to Cottonwood members' interests in making the area secure for dispersing grizzly bears. Doc. 22-1, ¶14. (Hockett Decl.).

The challenged grazing poses irreparable harm to Cottonwood members' conservation interests in protecting the specific grizzly bears that use this important corridor. Doc. 22-1 at 4, ¶ 13 (Hockett Decl.).  A plaintiff is not required to show

irreparable harm to a species as a whole before an injunction may issue. *Nat'l Wildlife Fed'n*, 886 F.3d at 818. Instead, protections must be achieved through "incremental steps, which include[s] protecting the remaining members of a species." *Id.* This comports with the original rule designating grizzly bears as a threatened species, which was "designed to ensure the species' conservation in all three of these ecosystems, *and to protect any members of the species occurring elsewhere in the 48 conterminous States*." 40 Fed. Reg. 31734, 31735 (July 28, 1975) (emphasis added). The decision to graze sheep based on inadequate NEPA analysis causes irreparable harm to Cottonwood members' interests in the specific grizzly bears that use the area as a corridor to connect the populations. Doc. 22-1 at 4, ¶ 13 (Hockett Decl.).

### 3. <u>The public interest and balance of harms tip sharply in Cottonwood's favor</u>.

Consideration of the public interest is generally subsumed by the balance of the equities analysis when the federal government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "Courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). "[T]he balance of equities favors the plaintiff" when the injunction will "do more good than harm." *Cottrell*, 632 F.3d at 1133 quoting *Hoosier Energy Rural Elec. Co-Op v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

Human safety always sharply outweighs livestock grazing.

Every state and federal agency that has weighed in on this issue has requested that Defendants stop grazing sheep in the Centennial Mountains to protect grizzly bears. A rule stripping Yellowstone grizzly bears of Endangered Species Act protections was recently vacated because the U.S. Fish and Wildlife Service "refused to analyze the issue of connectivity between the Greater Yellowstone grizzly and other populations." *Crow Indian Tribe*, 343 F. Supp. 3d at 1019. The land in question is the most likely corridor to connect the Yellowstone population with other populations. *See* Docs. 4-8 at 2; 4-6 at 1; 4-13 at 2. One federal agency pointedly told Defendants that the grazing challenged here is the reason why grizzly bears will continue to remain listed as a threatened species. Doc. 26-1 at 3.

The public interest and balance of harms favor the careful consideration of environmental impacts. *Cottrell*, 63d F.3d at 1138. The FEIS did not analyze the potential impacts on hikers from grizzly bears near the domestic sheep. "Most situations where grizzly bears are exposed to domestic sheep result in conflict[.]" Dkt. 7-1 at 32. "The probability of encounters between recreationalists and grizzly bears" when sheep are not present is "discountable." 7-1 at 24-25. The balance of harms and public interest favor an injunction because the dangerous bear encounters ended after the domestic sheep were removed. Doc. 7-1 at 26.

The Continental Divide National Scenic Trail (CDT) was established by Congress in 1978 and spans over 3,000 miles between Mexico and Canada, traverses five states and connects countless communities along its spine. Considered one of the greatest long-distance trails in the world, it is the highest, most challenging, and most remote of our National Scenic Trails.  Sixteen miles of the CDT travel through the Centennial Mountains of southwest Montana on U.S. Sheep Experiment Station land at elevations between 7,000 and 10,000 feet. Doc. 32 at 2; Doc. 4-2 at 28-29. Protecting the public safety of hikers on this public land sharply outweighs any harm Defendants might suffer.

The Trump and Obama Administrations have both tried to permanently end the grazing.[5]  The lead researcher for the Sheep Station stated that the loss of "summer range" in the Centennial Mountains is "not that big of a deal." Doc. 4-14. The researcher further clarified that no harm will be caused by a temporary closure

---

[5] Michael Wright, Appropriations committees include funding for controversial sheep station despite Trump budget, Bozeman Daily Chronicle, July 20, 2017. Available at:
https://www.bozemandailychronicle.com/news/environment/appropriations-committees-include-funding-for-controversial-sheep-station-despite-trump/article_d24382dd-10d7-58d6-98c5-6f35a3380a8f.html
https://www.bozemandailychronicle.com/news/environment/appropriationscommittees-include-funding-for-controversial-sheep-station-despitetrump/article_d24382dd-10d7-58d6-98c5-6f35a3380a8f.html. (last visited June 9, 2019).

of grazing in the summer allotments in question. Doc. 8 at 10, ¶ 20. Defendants

have not grazed the area for more than five years.

The public interest also favors an injunction because the U.S. Bureau of

Land Management requested that the Sheep Station end the grazing challenged

here so that it can reintroduce bighorn sheep. Doc. 26-1. The challenged grazing

precludes the U.S. Bureau of Land Management from reintroducing bighorn sheep

because the domestics carry pneumonia and other diseases that kill bighorns. The

U.S. District Court for the District of Idaho enjoined domestic sheep grazing by the

Sheep Station when bighorn sheep habitat overlapped with the domestic sheep in

another location. *W. Watersheds Project v. U.S. Forest Serv.*, 1:17-CV-434-CWD,

2017 WL 5571574 at *13 (D. Idaho Nov. 20, 2017). The balance of harms and

public interest sharply tip in favor of an injunction pending appeal.

### 4.  **No bond should be required.**

Rule 65 of the Federal Rules of Civil Procedure directs that "[t]he court may

issue a preliminary injunction or a temporary restraining order only if the movant

gives security in an amount that the court considers proper to pay the costs and

damages sustained by any party found to have been wrongfully enjoined or

restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to

the amount of security and may even dispense with the security requirement

altogether. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("Rule

65(c) invests the district court with discretion as to the amount of security required, *if any*."); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review.").

The U.S. District Court for the District of Oregon recently waived the requirement of a bond in another NEPA case challenging livestock grazing. *W. Watersheds Project v. Bernhardt*, 2:19-CV-0750-SI, 2019 WL 2372595 at *17 (D. Or. June 5, 2019). A bond requirement should be waived because Plaintiffs in this case are small nonprofit groups and because Defendants have not grazed in the disputed area for more than five years.

## IV.   CONCLUSION

For the foregoing reasons, Cottonwood respectfully requests that this Court enjoin Defendants from grazing domestic sheep in the Centennial Mountains until the appeal is decided.

/s/ John Meyer
JOHN MEYER

*Attorney for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 3,963 words, excluding the caption, signature blocks, table of contents, table of authorities, and certificate of compliance. Pursuant to Local Rule 7.1, a table of contents and table of authorities are included in this brief.

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2019 I filed this brief via CM/ECF to the following person:

MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North
Suite 3200
Billings, MT 59101
Phone: (406) 247-4667
FAX: (406) 657-6058
Email: mark.smith3@usdoj.gov

/s/ John Meyer
JOHN MEYER

*Attorney for Plaintiffs*